**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE FUND FOR ANIMALS, *et al.*    :
                                          :

       Plaintiffs,          :

                                            : Civil Action No. 05-777 (EGS)

    v.                  :

                                           :

GALE NORTON, Secretary,     :
Department of the Interior,  :
  *et al.*                     :

                                           :

       Defendants.         :

<u>**MEMORANDUM OPINION**</u>

Pending before this Court is plaintiffs' motion for a preliminary injunction to enjoin the U.S. Fish and Wildlife Service's ("FWS") final determination that mute swans are not protected by the Migratory Bird Treaty Act ("MBTA"). As a result of FWS's determination, the State of Maryland has declared its intention to begin killing up to 1,000 mute swans on or about June 20, 2005.[1] Therefore, plaintiffs contend that an injunction is necessary to prevent the irreparable harm to plaintiffs that would result if Maryland is permitted to carry out its plans. Upon consideration of plaintiffs' motion, the responses filed by

---

[1] The State of Maryland initially declared that it would begin killing mute swans as of May 15, 2005; however, on April 28, 2005, at a status conference in this case, a representative from Maryland's Attorney General's office informed the Court that in light of these proceedings the state would delay its plans until June 20, 2005.

the federal defendants and by defendant-intervenors, the replies
thereto, oral argument held on June 3, 2005, and the entire
record herein, the Court is persuaded that defendants'
overwhelming likelihood of success on the merits outweighs any
other equitable factors favoring plaintiffs, and therefore
plaintiffs' motion must be **DENIED.**

## I.  Parties

Plaintiff Fund for Animals is a nonprofit organization
dedicated to the protection of animals.  The Fund for Animals has
combined with another animal-protection organization, The Humane
Society of the United States, and together the organizations have
over 8 million members and constituents, including over 182,000
Maryland members.  Compl. ¶ 4.  These organizations "are
dedicated to protecting wild and domestic animals by actively
opposing those projects, plans, and events that result in the
killing or cruel treatment of animals."  *Id.*  Plaintiff brings
this action on its own behalf and on behalf of its members who
regularly observe, photograph, and study mute swans and other
migratory birds, and who would therefore suffer harm as a result
of the killing of mute swans in Maryland pursuant to the FWS
determination. *Id*. ¶ 5.

Plaintiff Patrick Hornberger lives on the Chesapeake Bay, in
Trappe, Maryland, in an area in which a dozen or more mute swans
can be found throughout the year. *Id*. ¶ 6. He enjoys viewing,

hearing, feeding, and photographing the mute swans on and near his property, and has developed relationships with individual mating pairs. *Id.*  In addition, he has traveled to several other areas within the State of Maryland to interact with mute swans, and plans to do so again in the future. *Id.*  Mr. Hornberger has also been active in organizing a local effort to prevent the State of Maryland from killing mute swans.  *Id.* ¶ 7.

Plaintiff Wanda Morton lives in Easton, Maryland, and owns a farm along the Wye River, a tributary of the Chesapeake Bay. *Id.* ¶ 9. She too enjoys viewing, hearing, feeding, and photographing mute swans on and near her property, and has become familiar with individual mating pairs, including naming several of them. *Id.* Ms. Morton fears that she may witness mute swans being harassed, injured, or killed as a result of FWS's determination.[2]  *Id.* ¶ 11.

Defendant Gale Norton is the Secretary of the Department of the Interior, and is sued in her official capacity, based on her duty to ensure that the agencies within the Department comply with the requirements of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712 (2003), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* (2003). *Id.* ¶ 14. Defendant

---

[2] Plaintiff Emily Cox lives in Massachusetts and makes similar allegations. *Id.* ¶¶ 12-13.  However, because she does not contend that she lives in or travels to Maryland, or that Massachusetts has any immediate plans to kill mute swans, her claims are not relevant to the motion presently before the Court.

Matthew Hogan is the Acting Director of the Fish and Wildlife Service, and is sued in his official capacity as the person directly responsible for FWS's determination. *Id.* ¶ 15.

Defendant-Intervenor Safari Club International ("SCI") is a nonprofit corporation incorporated in Arizona, with an office in Washington, D.C.  Intervenors' Resp. to Pl. Mot. for a Prelim. Inj. at 2.  SCI has 48,000 members; the organization's mission is to conserve wildlife, protect hunters, and educate the public on hunting and the use of hunting as a means of conservation.  *Id.* at 2-3.  Defendant-Intervenor Safari Club International Foundation ("SCIF") is a nonprofit incorporated in Nevada and it shares a similar mission with SCI.  *Id.* at 3.

Finally, Defendant-Intervenor Ducks Unlimited ("DU") is an organization of men and women "who celebrate the traditions and heritage of sport hunting as an integral part of sound wildlife management."  *Id.* at 5.  DU's mission "is to conserve, restore, and manage wetlands and associated habitats primarily for North America's waterfowl."  *Id.*  DU supporters hunt in Maryland and other areas where they contend mute swans jeopardize native wildlife and habitat.  *Id.* at 5-6.

## II.  Background[3]

The mute swan, *Cygnus olor*, is a nonnative species descended
from birds imported from Europe to North America for ornamental
purposes.  *See Hill v. Norton*, 275 F.3d 98, 99 (D.C. Cir. 2001).
There are approximately 14,000 mute swans in the "Atlantic
Flyway," which is made up of 17 states along the Eastern Seaboard
of the United States, ranging from Maine to Florida.  *See Fund
for Animals v. Norton*, 281 F. Supp. 2d 209, 214 (D.D.C.
2003)(internal citation omitted).  It is widely contended that
mute swans threaten native migratory, endangered, or threatened
animal species, in part because they over-consume aquatic
vegetation on which these species depend for survival.  *See Hill
v. Norton*, 275 F.3d at 99-100.

## A. Migratory Bird Treaties and the Migratory Bird Treaty Act

The United States has entered into four treaties, also
called Conventions, with other countries in order to protect and
preserve migratory birds.  The first of these Conventions was
signed with Great Britain, on behalf of Canada, in 1916, and
since then the U.S. has entered Conventions with Mexico, Japan,
and Russia.  Rather than list each species of bird covered by the
Convention, the Conventions define the term "migratory bird" to

---

[3] Portions of this section borrow heavily from this Court's
opinion in the earlier case of *Fund for Animals v. Norton*, 281 F.
Supp. 2d 209 (D.D.C. 2003)("*Fund for Animals I*"), discussed
below.

include a number of bird families.  Of particular relevance for
purposes of plaintiffs' motion, the Canadian Convention includes
in the definition of migratory birds, birds belonging to the
family "Anatidae or waterfowl, including brant, wild ducks,
geese, and swans" and the Mexican Convention defines migratory
birds to include all birds belonging to the "Familia Anatidae."
Pl. Mot. for a Prelim. Inj. at 3-4.  *See also Hill v. Norton*, 275
F.3d 98, 100-01 (D.C. Cir. 2001)(providing a description and
history of each treaty).

In 1918, Congress enacted the MBTA to implement the Canadian
Convention; the MBTA has since been amended to include the other
three Conventions.  *See Fund for Animals I*, 281 F. Supp. 2d at
216 (citations omitted).  The language of the MBTA is
unequivocal, and prohibits, among other things, any killing of
designated migratory birds

> [u]nless and except as permitted by regulations
> made as hereinafter provided in this subchapter,
> it shall be unlawful at any time, by any means or
> in any manner, to pursue, hunt, take, capture,
> kill, attempt to take, capture, or kill . . . any
> migratory bird . . . included in the terms of the
> [conventions between the United States and Great
> Britain, Mexico, Japan, and Russia.].

16 U.S.C. § 703.

The MBTA does not provide a definition of "migratory bird,"
but instead refers to the Conventions for the definition.  *Id.*
The MBTA authorizes the Secretary of the Interior to issue
regulations permitting the taking of migratory birds, provided

the regulations are consistent with the Conventions.  16 U.S.C. §
704; 712(2).

**B.  *Hill v. Norton*, 275 F.3d 98 (D.C. Cir. 2001)**

In 1973, pursuant to the authority vested in the Secretary
of the Interior by the MBTA, the Secretary published a list of
migratory birds protected by the Act; that list did not contain
mute swans.  *Hill*, 275 F.3d at 102.  In 1999, Joyce Hill filed
suit against the Secretary, claiming that the Secretary's
decision to exclude mute swans from the list of covered birds was
arbitrary and capricious and in violation of the Administrative
Procedure Act ("APA").  *Id.*  The district court deferred to the
agency's determination and ruled for the federal defendants.

In 2001, the U.S. Court of Appeals for the District of
Columbia Circuit reversed, finding under *Chevron U.S.A., Inc. v.
Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) that "even
assum[ing], *arguendo*, that the disputed agency action is not
positively foreclosed by the plain meaning of the statute" the
Secretary had shown nothing in the MBTA, the Conventions, or the
administrative record that supported the agency's decision to
exclude mute swans from the list of birds covered by the MBTA.
*Id.* at 99.  The Court of Appeals thus rested its decision to

vacate the Secretary's *List of Migratory Birds*, to the extent the list excluded mute swans, on *Chevron* step two.[4]  *Id.* at 106-07.

## C.  *Fund for Animals I*, 281 F. Supp. 2d 209 (D.D.C. 2003)

Prior to the U.S. Court of Appeals' 2001 ruling in *Hill v. Norton*, in which the Court of Appeals deemed mute swans to be protected by the Conventions and MBTA, primary responsibility for the management of mute swan populations fell to the states. *See Hill v. Norton*, 275 F.3d at 100. The federal Department of the Interior also engaged in management of mute swans on federal properties, including the Blackwater National Wildlife Refuge located in the State of Maryland, on an *ad hoc* basis. *Id.* at 100.

Following the Court of Appeals' ruling in *Hill*, the FWS began issuing permits authorizing the "take"[5] of mute swans to states requesting them for purposes of managing the mute swan

---

[4] "A reviewing court's inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference... In such a case, the question for the reviewing court is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation is based on a permissible construction of the statute." *See Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995)(quoting *Chevron,* 467 U.S. at 842-45).

[5] Under the regulations promulgated pursuant to the Migratory Bird Treaty Act, to "take" a bird covered by the Act is to "pursue, hunt, shoot, wound, kill, trap, capture, or collect," or to attempt any such act. 50 C.F.R. § 10.12 (2003).

population.  *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 214-15 (D.D.C. 2003) ("*Fund for Animals I*").  On March 13, 2003, the State of Maryland applied to FWS for a permit authorizing it to "remove up to 1,500 adult and subadult mute swans" as part of "a comprehensive mute swan management plan that will be implemented in 2003."  *Id.*  On April 17, 2003, the FWS granted Maryland's request for a permit authorizing the killing of up to 1,500 mute swans.  *Id.*

Shortly thereafter, plaintiff Fund for Animals commenced an action challenging the issuance of the Maryland permit. *Fund for Animals v. Norton*, Civil Action No. 03-1049 (D.D.C. 2003). The case was later voluntarily dismissed when Maryland agreed to temporarily surrender its permit pending preparation of a NEPA Environmental Assessment ("EA"). *Id.*

On August 7, 2003, FWS issued a "Finding of No Significant Impact" ("FONSI") and a Record of Decision ("ROD") memorializing its conclusion that the issuance of depredation permits as part of an integrated population management plan contemplating "lethal take" of mute swans, combined with egg addling,[6] pinioning,[7]

---

[6] Egg addling is described in the Final EA as enjoying widespread support as a "suitable and humane technique for suppressing production of young." Final EA at 17. It involves either (1) vigorously shaking mute swan eggs or puncturing a small hole in the shell and stirring the contents so as to physically destroy the developing embryo or (2) spraying food-grade oil on the surface of the egg so as to prevent the exchange of oxygen through the shell membrane and suffocate the embryo. *Id.*  Because the eggs are not visibly destroyed, the female mute

sterilization, and live-trapping and relocation, would have no "significant impact on the human environment," and therefore preparation of an Environmental Impact Statement ("EIS") was unnecessary. 68 Fed. Reg. 47,084-85. On August 11, 2003, FWS granted Maryland's renewed application for a depredation permit, authorizing the state to kill up to 525 mute swans between August 27 and December 31, 2003.

Plaintiffs immediately challenged all permits issued pursuant to the EA and moved for injunctive relief, asking this Court to enjoin the State of Maryland from killing any mute swans pursuant to the August 11, 2003 depredation permit.

On September 9, 2003, this Court granted plaintiffs' request for a preliminary injunction, finding that "as a whole, [plaintiffs'] arguments present a 'substantial case on the merits' sufficient to warrant the grant of injunctive relief in light of plaintiffs' compelling showing of irreparable harm," and that defendants had not persuaded the Court that they would suffer substantial harm or that the public would suffer as a result of a preliminary injunction. *See Fund for Animals v. Norton,* 281 F. Supp. 2d 209, 225, 237 (D.C.C. 2003).

---

swan continues to tend to them for the duration of the normal incubation period, thereby suppressing the reproductive success of a mating pair for a year. *Id.*

[7] Pinioning involves "amputation of the outer wing," and is "a commonly used method of flight restraint in waterfowl." 68 Fed. Reg. 47,084.

Following the Court's grant of a preliminary injunction, FWS withdrew all pending permits to take mute swans and agreed not to issue new permits to take mute swans without conducting a new environmental review consistent with NEPA and the MBTA.  Pl. Mot. for Prelim. Inj. at 6.

**D.   The Migratory Bird Treaty Reform Act**

On December 8, 2004, Congress enacted the Migratory Bird Treaty Reform Act of 2004 ("the Reform Act"), passed as a rider to an appropriations bill.  Pub. L. 108-447, Div. E, Title I, § 143(a)-(d), Dec. 8, 2004, 118 Stat. 3072.  The Reform Act amends the MBTA by limiting its application to native migratory bird species.  Specifically, the Reform Act provides:

> (b) Limitation on application to introduced species
>     (1) In general
>     This subchapter applies only to migratory bird
>     species that are native to the United States or
>     its territories.

16 U.S.C. § 703(b).

The Reform Act also required FWS to publish, after public comment and within 90 days of enactment of the Reform Act, a list of nonnative species not covered by the MBTA.  16 U.S.C. § 703 (notes).  Finally, Congress included in the Reform Act the following language:

> It is the sense of Congress that the language of this
> section is consistent with the intent and language of
> the 4 bilateral treaties implemented by this section.

16 U.S.C. § 703(d)(notes).

**E.   FWS Rulemaking Following Enactment of the Reform Act**

Pursuant to the Reform Act, on January 4, 2005, FWS announced a draft list of nonnative species not protected by the MBTA and provided an opportunity for public comment on the draft list.  70 Fed. Reg. 372 (Jan. 4, 2005); Administrative Record ("AR") 39 at 147.  On March 15, 2005, FWS published the Final List of Bird Species to Which the Migratory Bird Treaty Act Does Not Apply ("Final Rule").  70 Fed. Reg. 12710 (March 15, 2005) ("This notice identifies those species that are not protected by the MBTA, even though they belong to a biological family referred to in treaties that the MBTA implements, as their presence in the United States and its territories is solely the result of intentional or unintentional human-assisted introduction.").  The list included the mute swan as a bird species not covered by the MBTA.  *Id.* at 12714; AR 63 at 264.

During the public comment period on the draft list, plaintiffs submitted comments to the agency, maintaining that the Conventions protect mute swans and that withdrawing MBTA protection for mute swans would be inconsistent with the Conventions and the U.S. Court of Appeals' decision in *Hill v. Norton*.  Pl. Mot. for Prelim. Inj. at 8.  In addition, an organization called MBTA Advocates submitted comments arguing that mute swans remain protected under the MBTA because,

according to the FWS's criteria in the proposed rule, mute swans are native to the United States.  *Id.* at 9.

In the Final Rule, FWS treated the MBTA Advocates' comments as a petition for rulemaking, pursuant to § 553(e) of the APA, and denied the petition on the basis that the agency had made a factual determination that mute swans are not native to the United States or its territories.  70 Fed. Reg. at 12713.

## F.   The Present Litigation

As a direct result of FWS's Final Rule, Maryland's Department of Natural Resources ("MDNR") has made clear its intention to move forward with its mute swan management plan, which will include taking mute swans by lethal methods.  *See, e.g.*, MDNR Memorandum (April 1, 2005), Pl. Ex. 16.  In response to Maryland's plan, on April 18, 2005, plaintiffs filed suit in this Court.[8]  Plaintiffs' complaint includes two claims: first, that

> [b]y eliminating all protections for Mute Swans under
> the MBTA and the Canada and Mexico Conventions based on
> the Reform Act, even though the Conventions protect

_____

[8] Prior to filing this lawsuit, plaintiffs offered to assist MDNR with alternative methods of controlling the mute swan population, including egg addling.  Pl. Mot. for Prelim. Inj. at 11-12 (citing Declaration of John Grady (April 22, 2005)), Pl. Ex. 17; Env. Assessment for the Management of Mute Swans in the Atlantic Flyway (July 2003)(excerpt), Pl. Ex. 18.  In fact, plaintiffs proffer that they offered to postpone this litigation if Maryland would agree to limit its mute swan program to egg addling for a year.  *Id.* at 12.  According to plaintiffs, however, MDNR rejected these offers.  *Id.* (citing Pl. Ex. 15).

>Mute Swans, and the Reform Act fails to expressly
>abrogate those Conventions - instead providing that it
>is 'consistent with' the Conventions - the Service is
>violating the MBTA and the Conventions, and is acting
>in a manner that is arbitrary, capricious, an abuse of
>discretion, and contrary to law, in violation of [5
>U.S.C.] section 706(2) of the APA.

Compl. ¶ 36. Plaintiffs' second claim challenges the FWS's

denial of the rulemaking petition to add mute swans to the list

of birds protected by the MBTA, based on the same argument cited

above. *Id.* ¶ 38.

As described above, plaintiffs assert claims pursuant to the

Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712 (2003)

and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et

seq* (2003). Although the MBTA provides no private cause of

action against the United States government to enforce its

provisions, the law of this Circuit is clear: a plaintiff may sue

a federal agency under the APA for violations of the MBTA. *See

Hill v. Norton,* 275 F.3d at 103; *Humane Society of the United

States v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000) (holding that

federal agency action in violation of MBTA violates the

"otherwise not in accordance with law" provision of the APA).

The APA requires courts to set aside agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with the law." 5 U.S.C. § 706 (2003).

On April 26, 2005, plaintiffs filed the instant Motion for a

Preliminary Injunction, seeking to enjoin the Final Rule and

prevent Maryland's plans to begin taking mute swans on or about
June 20, 2005.

## III. Standard of Review

In considering whether to grant an application for emergency
injunctive relief, a court must consider four factors:   (1)
whether there is a substantial likelihood that plaintiffs will
succeed on the merits of their claims, (2) whether plaintiffs
will suffer irreparable injury absent an injunction, (3) whether
an injunction would harm the defendants or other interested
parties (the balance of harms), and (4) whether the public
interest would be furthered by an injunction.  *See Serono Labs.,
Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998) (citing
*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559
F.2d 841, 843 (D.C. Cir. 1977)).  The factors "must be viewed as
a continuum, with more of one factor compensating for less of
another."  *Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 141 (D.D.C.
2004).  Thus, "[i]f the arguments for one factor are particularly
strong, an injunction may issue even if the arguments in other
areas are rather weak."  *Serono Labs.*, 158 F.3d at 1318.

Finally, because interim injunctive relief is an
extraordinary form of judicial relief, courts should grant such
relief sparingly.  *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C.
Cir. 2004) ("A preliminary injunction is an extraordinary remedy
that should be granted only when the party seeking relief, by a

clear showing, carries the burden of persuasion."); *see also*
*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)(A preliminary
injunction is "an extraordinary and drastic remedy").

## IV.  Analysis

## A. Substantial Likelihood of Success on the Merits

Plaintiffs insist that the FWS's Final Rule as applied to
mute swans is "arbitrary, capricious, or otherwise not in
accordance with" the MBTA and the Conventions and must be
vacated.  Plaintiffs argue that because the MBTA and the
Conventions clearly protect mute swans, as found by the U.S.
Court of Appeals in *Hill v. Norton*, and, because Congress in
enacting the Reform Act stated its "sense of Congress" that the
Reform Act "is consistent with the intent and language" of the
Conventions, there is no clear intent on the part of Congress to
abrogate the Conventions to exclude mute swans.  Pl. Mot. for
Prelim. Inj. at 14.  In other words, plaintiffs argue that in
order to validly exclude mute swans from the Conventions and the
MBTA, Congress needed to first recognize that the Conventions
protect mute swans and that there was binding D.C. Circuit
precedent concluding that the Conventions protect mute swans, and
second, make clear in the Reform Act that Congress intended to
terminate protections for mute swans and other nonnative species,
despite the fact that those species are protected by the
Conventions.  Tr. at 6.

In support of this argument, plaintiffs rely primarily on *Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003), in which the U.S. Court of Appeals for the District of Columbia Circuit upheld this Court's dismissal of a lawsuit on the grounds that two Congressional appropriations riders expressed no clear intent to abrogate an executive agreement that otherwise barred the plaintiffs' suit.[9]   Plaintiff Fund for

---

[9] The *Roeder* case was a class action suit brought by American citizens taken hostage in Iran and their families against the Republic of Iran and Iran's government seeking damages related to plaintiffs' 444-day ordeal, on the grounds that the plaintiffs' claims were barred by an executive agreement.   The United States had intervened in the case as a defendant and moved to dismiss the action; this Court found that it had no choice but to grant the government's motion, and the Court of Appeals agreed.

The Foreign Sovereign Immunity Act ("FSIA") generally bars suits against foreign countries in the U.S. courts, except in limited circumstances.  *Id.* at 235.  At the time of their lawsuit, the FSIA was a bar to the hostage plaintiffs' suit against Iran.  *Id.*  Congress, however, passed two appropriations riders explicitly citing the plaintiffs' lawsuit and amending the FSIA to create an exception to Iran's immunity from suit for purposes of plaintiffs' case.  *Id.*  As the Court of Appeals put it, the "evident purpose" of Congress's legislation was to remove the government's argument that plaintiffs' case was barred, in response to the government's effort to have plaintiffs' case dismissed.  *Id.*

Nevertheless, this Court reluctantly concluded that the plaintiffs' case had to be dismissed.  In 1980, in order to obtain the release of the American hostages, the United States entered into an agreement with Iran, known as the Algiers Accords, that included a provision by which the United States agreed to "bar and preclude the prosecution against Iran of any ... claim of ... a United States national arising out of" the hostages' capture and captivity.  *Id.* at 232 (internal citations omitted).  The Congressional amendments passed in response to plaintiffs' case said nothing about the Algiers Accords.  *Id.* at 236.  Plaintiffs nevertheless argued that Congress had intended the riders to abrogate the Algiers Accords as well as create the

Animals urges the Court to reach the same result here, arguing that the Reform Act expresses no clear Congressional intent to abrogate the underlying Conventions.  As the Court of Appeals said in *Roeder*,

> Congress (or the President acting alone) may abrogate an executive agreement, but legislation must be clear to ensure that Congress - and the President - have considered the consequences.  The 'requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.' *Gregory v. Ashcroft*, 501 U.S. 452, 461, 111 S.Ct. 2395, 2401, 115 L.Ed. 2d 410 (1991).  The kind of legislative history offered here cannot repeal an executive agreement when the legislation itself is silent.  *See Comm. of United States Citizens [Living in Nicaragua v. Reagan],* 859 F.2d [929], 936-37.

*Id.* at 238.

In the instant case, while defendants did not address the *Roeder* decision in their briefing, they do argue that the Reform Act on its face is a clear expression of Congressional intent to exclude nonnative species - including mute swans - from the MBTA. Moreover, defendants insist that plaintiffs cannot use the "sense of Congress" language[10] in the notes of the Reform Act to *impose*

---

exception to the FSIA, and looked for support to an explanatory statement related to the second Congressional amendment that the legislation would allow the plaintiffs' claim against Iran to stand "notwithstanding any other authority."  *Id.* at 237 (internal citations omitted).

[10] Again, that language is: "It is the sense of Congress that the language of this section is consistent with the intent and language of the 4 bilateral treaties implemented by this section."

ambiguity into what is, according to defendants, an unambiguous statute.  Finally, defendants maintain, the legislative history removes any doubt that in passing the Reform Act, Congress fully considered the Conventions and the *Hill v. Norton* case before it consciously and explicitly removed nonnative bird species from the MBTA.[11]

Defendants first point out that there is nothing ambiguous about the Reform Act's intent: the plain language of the statute states that the MBTA "applies only to migratory bird species that are native to the United States or its territories."  16 U.S.C. § 703(b)(1).  As for plaintiffs' reliance on the "sense of Congress" provision, defendants submit that such precatory language cannot be interpreted to trump the operative sections of the legislation.  Def. Opp. at 15.  For example, defendants cite several cases to support their contention that "sense of Congress" language in a statute is precatory and not legally binding and certainly should not be used to create ambiguity in an otherwise unambiguous statute.  *See, e.g., Yang v. California Dept. of Social Services*, 183 F.3d 953, 958 (9th Cir.

---

[11] Defendants also note, in a footnote, that the *Hill* decision was decided on *Chevron* step-two grounds - in other words, that the agency had failed to conclusively establish that the treaties and the MBTA did not cover mute swans - and thus, contrary to plaintiffs' assertions, the *Hill* court did not rule that a plain reading of the Conventions and the MBTA conclusively established that mute swans are covered.  Def. Opp. at 15, n.4 (citing *Hill*, 275 F.3d at 104-05.).

1999)(holding that a "sense of Congress" provision was precatory and did not bestow legal rights); *Monohan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 994-95 (1st Cir. 1992)(holding that the "use of the term 'should' and 'the sense of Congress' language indicate that the statute is merely precatory"); *Trojan Technologies, Inc. v. Pennsylvania*, 916 F.2d 903, 909 (3rd Cir. 1990)(characterizing a "sense of Congress" provision as persuasive rather than mandatory). *But see State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1116 (8th Cir. 1973)(finding "sense of Congress" provisions useful in resolving ambiguities).

Finally, defendants maintain that even if the Court finds that the Reform Act is ambiguous as a result of the "sense of Congress" provision, the legislative history in this case removes any doubt of Congress' intent. In fact, defendants contend that in stating its "sense" that the Reform Act is consistent with the intent and language of the Conventions, Congress was merely "expressing its opinion that the treaties were never intended to apply to nonnative species." Def. Opp. at 17. In support, defendants cite the House committee report on the Reform Act:

> Neither the international Conventions nor Congress in crafting the MBTA anticipated the presence of non-native bird species in the wild. In fact, until 2001, official federal policy treated non-native bird species as outside the MBTA and under the jurisdiction of the States. However, in 2001, a federal appeals court held for the first time that a non-native human-introduced species (in this case the mute swan) was covered by the MBTA.

\*\*\*

> H.R. 4114 would amend the Migratory Bird Treat Act to
> clarify that the provisions of that Act apply only to
> species native to the United States, Canada, and Mexico
> (the species covered by the Conventions with Japan and
> Russia are all native to the United States).  There is
> no historical indication that the United States,
> Canada, and Mexico ever intended for the Conventions to
> apply to human-introduced species not native to the
> party countries.

H.R. Rep. No. 108-520, 2004 WL 1236793 at 5-6.  Defendants also

cite language from the Senate committee report:

> Title I of S.2547 clarifies that the Migratory Bird
> Treaty Act's prohibition on taking, killing, or
> possessing migratory birds applies only to native
> migratory bird species whose occurrence in the United
> States results from natural biological or ecological
> conditions.

S. Rep. No. 108-313, 2004 WL 109561 at 3.  And

> In a case involving the application of the Migratory
> Bird Treaty Act to mute swans (Hill v. Norton), the
> D.C. Circuit Court decided that the convention with
> Canada did not make a distinction between native and
> non-native members of the listed families.  According
> to the court, the reference in the convention to the
> swan family meant that the convention applied to mute
> swans.  This line of reasoning could ultimately result
> in the Federal government being required to afford
> protection to other non-native species, such as the
> rock pigeon, Eurasian collared-dove, and other invasive
> species that belong to treaty families.  Like the mute
> swan, many of these invasive species are causing harm
> to the natural and economic resources of the United
> States.

S. Rep. No. 108-313 at 2-3 (2004); *see also* H.R. Rep. No. 108-520

at 4-6 (2004).  Defendants also cite and quote extensive

additional language from Rep. Gilchrest's statement introducing

the bill, and from the committee reports of both chambers that

clearly evince the fact that both mute swans and the *Hill* decision were a focal point of Congress' consideration of the Reform Act.  Def. Opp. at 20-23.

In light of this clear and unambiguous Congressional intent, and in accordance with governing principles of law in this case, this Court has no choice but to conclude that defendants have established an overwhelming likelihood of success on the merits. As this Court explained in *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140 (2002), *aff'd,* 333 F.3d. 228 (D.C. Cir. 2003),

> When a court is presented with a statute and a previously-enacted international agreement that potentially cover the same legal ground, there are three possible relationships between the two: first, the statute can unambiguously fail to conflict with the agreement; second, the statutory language can be ambiguous, and one of its possible interpretations can conflict with the agreement; and third, the statute can unambiguously conflict with the agreement.  With respect to the first situation, when a statute is unambiguous in its language and effect and does not conflict with an earlier international agreement, both the statute and agreement co-exist as valid law.
>
> If a court is presented with the second situation, a conflict between one possible reading of an ambiguous statute and an earlier international agreement, that court must inquire into Congress' intent with respect to the abrogation of the international agreement prior to giving force to the statute. ...
>
> \*\*\*
>
> If, however, a court is presented with the third situation, when the unambiguous statutory text conflicts with an earlier treaty or international executive agreement, precedent of equally long-standing requires the later statutory provision to prevail. *See,*

*e.g., Reid v. Covert*, 354 U.S. 1, 17, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957); *Whitney v. Robertson*, 124 U.S. 190, 191, 8 S. Ct. 456, 31 L. Ed. 386 (1888); *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 936-37 (D.C. Cir. 1988); *South African Airways v. Dole*, 817 F.2d 119, 126 (D.C. Cir. 1987). Furthermore, if the text of the later statute is unambiguous, that statute is legally binding *regardless* of Congress' intent to abrogate the earlier treaty or agreement. *See*, *e.g., South African Airways*, 817 F.2d at 126. As the Supreme Court explained in 1889:

> [I]f congress has this power it is wholly immaterial to inquire whether it has, by the statute complained of, departed from the treaty or not; or, if it has, whether such departure was accidental or designed; and, if the latter, whether the reasons therefor were good or bad. *Chae Chan Ping v. United States*, 130 U.S. 581, 602-603, 9 S. Ct. 623, 32 L. Ed. 1068 (1889).

*Roeder*, 195 F. Supp. 2d at 169-70 (additional internal citations omitted). *See also Ribas Y Hijo v. United States*, 194 U.S. 315, 324 (1904)(when there is a "conflict between an act of Congress and a treaty,–each being the supreme law of the land,–the one last in date must prevail in the courts"); *Breard v. Green*, 523 U.S. 371, 376 (1998)("when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null").

In the instant case, plaintiffs cannot prevail in any of these three situations. First, nothing in the Reform Act itself appears ambiguous. Both the title and the statutory language of the Migratory Bird Treaty *Reform* Act indicate that Congress intended to modify the MBTA to exclude nonnative species.

23

Second, even assuming, *arguendo*, that the "sense of Congress" provision imposes some ambiguity into the statute, even a cursory review of the legislative history in this case makes clear that Congress intended to exclude nonnative species regardless of whether the Conventions previously covered those species, and the Court must give meaning to that intent.

Lastly, even if the Reform Act is read to conflict with the Conventions - which plaintiffs maintain is the case in light of *Hill v. Norton* - the later-enacted Reform Act is legally binding "*regardless* of Congress' intent to abrogate the earlier treaty or agreement." 195 F. Supp. 2d at 170.  In contrast, the *Roeder* case involved the second situation, an arguably ambiguous statute that could be read to conflict with the Algiers Accords and thus required clear Congressional intent before the Court could read the statute to abrogate the Accords.  *Roeder*, 195 F. Supp. 2d at 171.  There, the legislation at issue amended one statute but did not even mention the Algiers Accords, yet plaintiffs asked the Court to conclude that Congress had nevertheless abrogated the Accords.  333 F.3d at 236.  Here, the sole and explicit purpose of the Reform Act was to reform the MBTA.  Therefore, plaintiffs' reliance on *Roeder* is misplaced.

Finally, plaintiffs contend that the 108th Congress' "sense" that the Conventions never covered nonnative species should not be given credence because the 108th Congress was not a party to

those Conventions.  Pl. Reply at 5; Tr. at 6, 10 (relying on
*Public Employees Retirement System v. Betts*, 492 U.S. 158, 168
(1989)).  Plaintiffs' argument misses the point.  Whether or not
the Conventions and the MBTA were originally intended to cover
nonnative species, Congress clearly has the power to abrogate or
modify a treaty or earlier legislation, and when it does so, that
is the final word.  *See Chae Chan Ping*, 130 U.S. at 602-603
(whether the legislation at issue "depart[s] from the treaty or
not; or, if it has, whether such departure was accidental or
designed; and, if the latter, whether the reasons therefor were
good or bad" is "wholly immaterial.").

In conclusion, given the plain language of the statute, the
persuasive legislative history, and the governing case law,
defendants' have an overwhelming likelihood of success on the
merits.

**B.   Irreparable Injury**

Plaintiffs submit that they will suffer a number of harms if
MDNR is permitted to go forward with its plan to kill mute swans.
First, plaintiffs will have fewer opportunities to view, interact
with, study, and appreciate these animals.  Second, plaintiffs
may well witness individual swans being injured or killed.
Finally, plaintiffs in some cases have developed relationships
with specific mute swans and contemplating injury to or death of
these particular swans causes plaintiffs harm.  Pl. Mot. for

25

Prelim. Inj. at 27-29 (citing Hornberger Decl. ¶¶ 6-9, Pl. Ex. 19; Morton Decl. ¶ 4, Pl. Ex. 20).

Defendants respond that plaintiffs cannot demonstrate irreparable harm because the MBTA is not a conservation statute such as the Endangered Species Act and the MBTA always contemplated that some birds would be taken and hunted, therefore the fact that a mute swan may be taken is not irreparable harm under the statute. Def. Opp. at 29. Defendants also point out that because plaintiffs do not oppose other methods of mute swan population control, such as egg addling, they cannot argue irreparable harm while recognizing the need to control the population and agreeing to such measures.

In *Mute Swans I*, this Court found that plaintiffs had demonstrated a compelling showing of irreparable harm. 281 F. Supp. 2d at 219-22 (relying on *Fund for Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998); *Fund for Animals v. Glickman*, Civil Action No. 99-245, Tr. of Hr'g Mot. for T.R.O. at 57-58 (D.D.C. Feb. 12, 1999); *Sierra Club v. Martin*, 933 F. Supp. 1559, 1570-71 (N.D. Ga. 1996); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993)). In that case, this Court found that similar arguments made by defendants against a showing of irreparable harm to plaintiffs were unpersuasive. 281 F. Supp. 2d at 221-22 (finding that plaintiffs had alleged harm based on the killing of particular and additional swans).

In the instant case, the *Mute Swans I* analysis of
irreparable harm has not changed; if anything, the irreparable
harm to plaintiffs is greater in this case because Maryland now
plans to kill nearly twice as many mute swans as in 2003 <u>and</u>
under the FWS's Final Rule and unlike in 2003, a federal permit
is no longer required to kill mute swans.  However, while
plaintiffs in this case have again demonstrated a compelling
showing of irreparable harm, what has changed since 2003 is the
state of the law: as discussed above, Congress has since acted to
exclude mute swans from the protections offered by the
Conventions and the MBTA.

## C.   Harm to Third Parties (Balance of Harms)

Plaintiffs contend that defendants will not suffer any
substantial harm if the Court grants a "limited injunction" while
it decides this case on the merits.  After all, plaintiffs argue,
FWS has been protecting mute swans at least since 2001, so a few
more months, or even another year, will not create a substantial
hardship for defendants or for Maryland.  Finally, plaintiffs
dispute the evidence offered to establish that mute swans are
measurably damaging the Chesapeake Bay.  Pl. Mot. for a Prelim.
Inj. at 30-31.

As the defendants readily conceded during oral argument on
plaintiffs' motion, because Maryland is not a party to the case
it is difficult for defendants to prevail on this factor.  Tr. at

27-28, 35.  Defendant-intervenors argue, however, that mute swans eat up to 10 million pounds of aquatic grass per year and that projections show that at current levels, by the year 2010 there will be as many as 20,000 mute swans if the population is not controlled.  Tr. at 33.  The harm to other parties, defendant-intervenors allege, is that other species rely on this grass to survive and that if left uncontrolled, the damage to these species and the Chesapeake Bay is significant.  Tr. 33-34.

The Court recognizes that Maryland has been prohibited from using lethal means to carry out its mute swan population control program for at least the last four years, and that further delay may now or at some point in the future rise to the level of substantial harm to Maryland's environmental interests or to defendant-intervenors.  Nevertheless, without reaching a conclusion as to the level of harm to the environment caused by the mute swans, the Court finds that defendants have thus far failed to show substantial harm to third parties that would result from a preliminary injunction.[12]

**D.   Whether a Preliminary Injunction is in the Public Interest**

Plaintiffs argue that an injunction is in the public interest because the public has an interest in protecting migratory birds, ensuring FWS complies with federal law, and

---

[12] In fact, neither the federal defendants nor the defendant-intervenors even addressed this prong of the preliminary-injunction analysis in their briefs.

ensuring that Congress expresses a clear intent when it acts to modify or abrogate a treaty or its implementing laws.  Pl. Mot. for Prelim. Inj. at 33-34; Tr. at 38.

While the Court agrees with plaintiffs that the public has an interest in each of these goals, there is nothing to indicate in this case that those interests are best served by a preliminary injunction.  As discussed above, the record in this case indicates that Congress did express a clear intent to exclude nonnative species, including mute swans, from the protections afforded other migratory birds by the Conventions and the MBTA.  This does not appear to be a case - as much as plaintiffs attempt to portray it as such - wherein Congress passed a statute without considering or recognizing the consequences that the statute would have on an international obligation.  Rather, it appears Congress fully intended the consequences of the Reform Act - that is, that nonnative species, including mute swans, would no longer receive federal protection. Accordingly, there is no evidence that FWS arbitrarily or capriciously failed to comply with the law in issuing the Final Rule including mute swans on the list of nonnative species not covered by the MBTA.

While the swans for whom plaintiffs advocate may be mute, these swans have certainly been spoken for and about at length over the last four years.  As this Court said in *Mute Swans I*,

"[t]here is no question that all parties before the Court have
the interests of the environment, and particularly of the
Chesapeake Bay, at heart."  281 F. Supp. 2d at 237.  That
statement is no less true for the current case.  The task of
balancing the plaintiffs' interest in the mute swans with the
larger public's other environmental interests at stake here is
not an easy one - nor is it a task for the Court.

This issue has been debated at the local, state, and federal
level.  Plaintiffs have done an admirable job of advocating for
these animals: from a local-resident petition to stop Maryland's
program, to lobbying Congress, submitting comments to FWS, and
filing several federal lawsuits, plaintiffs have fought to
maintain federal protection for the mute swans.[13]  Nevertheless,
the United States Congress has made a determination that mute
swans are not to be protected by the migratory bird treaties our
nation has entered into with Canada and Mexico, and the U.S.
Department of the Interior has accordingly gone through a
rulemaking process to carry out that Congressional action.
Moreover, the State of Maryland has apparently made a
determination that lethal removal of the swans is its preferred
method of controlling the state's mute swan population.

---

[13] For example, Plaintiff Hornberger co-founded an
organization called "Save Maryland Swans" and gathered more than
two-hundred signatures from local residents in an effort to stop
Maryland's program.  Compl. at ¶ 7.

30

While plaintiffs may strongly disagree with the Reform Act, the Final Rule, and Maryland's approach to the mute swan population, plaintiffs point to nothing in the record to indicate that the Congressional process or the rulemaking process in this case is suspect, flawed, or unlawful.  Therefore, the Court must conclude that respect for the extensive public debate in this case and the outcome of that debate weighs against issuing a preliminary injunction where, in light of the defendants' likelihood of success on the merits, a preliminary injunction would merely serve to delay the inevitable.

**V.  Conclusion**

Upon consideration of the factors which courts are directed to weigh when considering whether to grant the extraordinary relief of a preliminary injunction, this Court concludes that while plaintiffs have made a compelling showing of irreparable harm, the defendants' likelihood of success on the merits is so significant that it outweighs the other factors.  For the reasons stated herein, therefore, plaintiffs' motion for a preliminary injunction is hereby **DENIED.**

An appropriate Order accompanies this Memorandum Opinion.


Signed:    Emmet G. Sullivan
           United States District Judge
           June 15, 2005

Notice via ECF to all counsel of record.

31